UNITED STATES of America,
Appellee,

v.

Charles WILLIAMS, Appellant.

No. 589, Docket 71-2069.

United States Court of Appeals,
Second Circuit.

Argued March 9, 1972.

Decided April 3, 1972.

Harold J. Friedman, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y. and David G. Trager, Asst. U. S. Atty., on brief), for appellee.

Kristin Booth Glen, New York City (Jeffrey E. Glen, New York City, of counsel), for appellant.

Before FRIENDLY, Chief Judge, TIMBERS, Circuit Judge, and JAMESON, District Judge.*

JAMESON, District Judge:

Appellant, following a jury trial, was convicted of larceny from a federally insured savings and loan association in violation of 18 U.S.C. 2113(b) and sentenced to ten years imprisonment. He appealed, contending that (1) the district court erred in refusing to suppress his oral statement to an F.B.I. agent, and (2) under 18 U.S.C. section 5032 the court had no jurisdiction to try him as an adult. We affirmed on the first claim. Recognizing that the record was incomplete "as to whether appellant

---

* Senior District Judge of the District of Montana, sitting by designation.

refused to consent to juvenile procedure or whether the Attorney General directed criminal prosecution", we remanded for findings and further evidence, if necessary, on this issue. United States v. Williams, 442 F.2d 1039, 1040 (2 Cir. 1971).

The hearing on remand was held on July 9, 1971 and September 8, 1971.[1] On September 22, 1971 the district judge entered a Memorandum of Decision and Order finding that the district court "had jurisdiction to proceed to trial of the defendant in a criminal prosecution as an adult. Not only did the defendant knowingly refuse to consent to treatment as a juvenile delinquent, but the Attorney General expressly directed that he be proceeded against as an adult."

18 U.S.C. § 5032 provides:

"A juvenile alleged to have committed one or more acts in violation of a law of the United States not punishable by death or life imprisonment, and not surrendered to the authorities of a state, shall be proceeded against as a juvenile delinquent if he consents to such procedure, unless the Attorney General, in his discretion, has expressly directed otherwise.

"In such event the juvenile shall be proceeded against by information and no criminal prosecution shall be instituted for the alleged violation."

Under section 5033 the consent must be given "in writing before a Judge of the District Court of the United States having cognizance of the alleged violation, who shall fully apprise the juvenile of his rights and of the consequences of such consent. Such consent shall be deemed a waiver of a trial by jury."

The sole issue for determination on this appeal is whether the appellant knowingly refused to consent to treatment as a juvenile delinquent and waived his rights under the Juvenile Delinquency Act. While the district court found further that the Attorney General expressly directed that appellant be proceeded against as an adult, the Government has recognized in its brief that since "the defendant did not consent to juvenile delinquency treatment there was no need to secure the Attorney General's explicit authorization to treat appellant as an adult." It is expressly stated that "the Attorney General never authorized adult prosecution."

■ It is recognized at the outset that there is no statutory requirement that the court apprise the juvenile of his rights except in connection with his signing of a written consent to proceed under the Juvenile Delinquency Act. Nor is there any requirement for a written refusal to consent. It is clear, however, that in order to make an intelligent waiver of his rights under the Act and knowingly refuse to consent, a juvenile must in some manner be fully apprised of his rights and the respective consequences of proceeding under the Juvenile Delinquency Act and as an adult.

■ Appellant was 16 years of age when the offense was committed on December 13, 1967. He was arrested on July 2, 1968 and arraigned before a United States Commissioner. Simon Chrein, Senior Trial Attorney of the Legal Aid Society, was assigned to represent appellant and did in fact represent him from the time of arraignment through trial. The indictment was filed March 13, 1969. At the time of his jury trial in April, 1970 and his sentencing on July 6, 1970 appellant was 18 years of age.[2] A juvenile is defined by 18 U.

---

1. Reference to the transcript of the July hearing will be designated "T–J" and to the September hearing "T–S".

2. At the suppression hearing on February 9, 1970 appellant testified that he was born on November 5, 1951. At the conclusion of the hearing the court commented that, "He said he was born on November 5, 1951. We have no juvenile problem." (T. 57) The contention with respect to appellant's refusal to consent to juvenile procedure was first raised on appeal. At a separate hearing on

S.C. § 5031 as a person who has not attained his eighteenth birthday. This refers to the time when the offense was committed. United States v. Fotto, 103 F.Supp. 430 (S.D.N.Y.1952).

At the remand hearings the Government relied upon the testimony of Herbert Tamres, the Assistant United States Attorney who prosecuted the case, and an exchange of letters between Mr. Tamres and the Department of Justice. Appellant and his parents testified. Mr. Chrein was not called by either party.

In a letter dated January 14, 1969 Tamres requested authorization to proceed against Williams and two co-defendants "under the adult criminal statutes, rather than as juvenile delinquents." The letter reads in part:

"The undersigned has made frequent requests of the attorneys for the three defendants for their consent to proceed against them as juveniles. * * * Charles Williams has had the Legal Aid Society assigned to represent him and he, too, will not agree to juvenile treatment. * * *

"In view of the above factors, it appears that there is no other recourse in these matters but to proceed against these defendants under the adult criminal statutes." (Ex. 1).

In reply the Department of Justice wrote in part:

"All three defendants have refused to consent to juvenile procedure under the Federal Juvenile Delinquency Act. In these circumstances you see no alternative to criminal prosecution and you request our advice.

"The statute, 18 U.S.C. § 5032, requires that a consent to juvenile procedure be executed in writing before the United States District Court. If the subjects refuse to consent to juvenile procedure, no authorization is needed for criminal prosecution. To protect your record, you should make a record of the subjects' refusal to accept juvenile procedure. Thus, you may proceed with criminal prosecution against the subjects Hunt and Williams." (Ex. 2)

At the July 9 hearing Tamres testified on direct examination:

"Q. And in the course of conferring with defense counsel, did you have occasion to discuss with them the applicability of the juvenile delinquency statutes?

"A. I can't place the time or date but I do recall that we did have that discussion with regard to Mr. Williams and with regard to the co-defendant, Mr. Pecheco, who was also underage.

"Q. Did you obtain in these conferences an indication from the defense concerning whether the defendants, and particularly the defendant Williams, would or would not consent to be treated as a juvenile delinquent and proceeded against in that fashion?

"A. At the time, there was a very strong indication that neither of them would wish to proceed as juvenile delinquents.

"Q. Are you stating, then, that there was refusal of consent to be treated as a juvenile delinquent by Mr. Williams?

"A. Transmitted through a third party, his counsel. I don't recall speaking in the presence of his counsel with Mr. Williams directly, but I do recall there was that transmittal.

\* \* \* \* \* \*

"The Court: Did the lawyer tell you why he didn't want to be proceeded against as a juvenile?

"The Witness: To the best of my recollection, yes, he did tell me why Mr. Williams and Mr. Pecheco both were of one mind, apparently.

February 9, 1970 involving a younger co-defendant procedures under the Juvenile Delinquency Act were discussed. It does not appear whether appellant was present during that hearing.

"The Court: What did they say?

"The Witness: That they felt that if they went to trial, that they could beat the charges.

"The Court: Oh. I thought it had something to do with the belief at that time that a juvenile was not entitled to a trial by jury.

"The Witness: I don't recall * * * any conversation about that.

"The Court: Which understanding has, of course, been cancelled recently." (T-J 12–13)

On cross-examination Tamres testified in part:

"Q. Now, with regard to Government's Exhibit No. 2, * * * that is a response to the letter which you had written about a month prior thereto, * * * you will note in it that there was a suggestion made that you appropriately protect the record by making a record of the refusal of the subjects to accept juvenile procedure. Did you at any time in this Court or in the District Court at the time that this matter came on before the Court ever make such a record to indicate, on the record, that this defendant had refused such treatment?

"A. No. I don't recollect that I did.[3]

* * * * * *

"Q. And do you know of any occasion when the advantages of the treat-ment under the Juvenile Delinquency Act were discussed with this defendant in your presence?

"A. No." (T-J 14–15)

Tamres testified further that following the arraignment on July 2, 1968 appellant's parents approached him and he informed them that the juvenile delinquency statutes were applicable in their son's case. This was denied by appellant's parents. With respect to this conversation, we accept the finding of the district court:

"During the arraignment the defendant's parents identified themselves. After the arraignment the parents approached the Assistant United States Attorney Herbert Tamres and inquired as to what could be done for their son. Mr. Tamres advised them that, since Williams was underage, they should give some consideration to discussing juvenile delinquency status and procedure for him." [4]

Appellant testified that his trial counsel did not at any time discuss with him possible treatment under the Juvenile Delinquency Act, he did not at any time refuse to sign a consent, and he first learned of the provisions of the Juvenile Delinquency Act from Mr. Sparrow, who was substituted as his counsel after the trial. He admitted on cross-examination that he was aware of the juvenile delinquency statutes in the state court and had been proceeded against as a juvenile in state court.[5]

3. Had the United States Attorney complied with this suggestion of the Department of Justice, the issue now before this court would probably have been resolved.

4. Tamres testified that this conversation occurred after Chrein had left the hearing room. There is no suggestion that appellant himself was present. Nor is there any evidence that the parents ever discussed with appellant possible procedure under the Juvenile Delinquency Act. Tamres testified that the parents had advised him that "they were unable to discuss anything with Charles Williams over the course of the year or two before that. They were unable to

be parents to him. They were more or less appealing to me as to what could be done for Charles Williams." (T-J 42–43)

5. It is obvious from the proceedings on the hearing to remand that the district judge, who had also tried the case, seriously questioned appellant's credibility. Lack of credibility on the part of both appellant and his parents, however, does not supply the affirmative proof necessary to establish a knowing refusal to consent. There is nothing in the record of any of the court proceedings from arraignment through trial to indicate that procedures under the Juvenile Delinquency Act were considered. The

As noted *supra,* Simon Chrein, who represented appellant from arraignment through trial, did not testify at either hearing. At the hearing on July 9, 1971 there was some discussion between the court and counsel relative to the use of the Legal Aid Society file and calling Mr. Chrein as a witness. After conferring with appellant, his counsel informed the court that appellant "authorized me to indicate to the Court that he will waive the lawyer-client privilege" and that anything contained in the file of the Legal Aid Society "may be submitted as evidentiary matter in this case." Counsel for the Government stated that Mr. Chrein would not be available for another week. He indicated that he had talked with Mr. Chrein and felt very strongly that Chrein's "testimony would be desirable in any event." [6] (T-J 44–45)

At the adjourned hearing on September 8, 1971 the Government was represented by other counsel. The following is the only reference to the failure to call Chrein as a witness:

"Mr. Sparrow (counsel for appellant): * * *

"I think your Honor will recall that at the conclusion of the hearing of July 9th we consented to a waiver of the lawyer-client privilege between the defendant and Mr. Chrein as to anything that might appear in the Legal Aid file to indicate there was any discussion or any other advice pertaining to the Juvenile Delinquency Act.

"I understood there was a possibility that Mr. Chrein would be called so we might interrogate him, but we have no other witnesses.

"The Court: Did you call him?

"Mr. Sparrow: No, I did not.

"The Court: Did you call Mr. Chrein?

"Mr. Friedman: (counsel for the Government): No, your Honor. He is available.

"The Court: Anything further?

"Mr. Friedman: I would like to state that the .Government's position is that the court did have jurisdiction because there was no consent found in the file and in order for one to benefit under the Juvenile Delinquency Act there must be a consent and there was no consent." (T-S 12)

It is true of course that appellant did not consent, pursuant to section 5033, to proceeding under the Juvenile Delinquency Act. This is not in itself, however, proof that he *knowingly* refused to consent. It is unfortunate that Chrein was not called as a witness by one of the parties, or by the court when neither party called him. He was the one person aside from appellant himself who could give direct testimony on the crucial question of whether appellant was properly advised of his rights under the Juvenile Delinquency Act. It may be, as counsel for the Government suggested at oral argument, that Chrein may not have recalled just what was said. Under all the circumstances we do not deem it proper to draw an inference against either party for failing to call Chrein to testify at the adjourned hearing.

█  In any event, there is no direct evidence that Chrein explained the provisions of the Juvenile Delinquency Act to appellant or that appellant knowingly refused to consent to proceedings under the Act. This may not be established by Tamres' hearsay and somewhat conclusory testimony with respect to his conversations with appellant's counsel.

On March 5, 1968 a three-judge court decided Nieves v. United States, 280 F. Supp. 994 (S.D.N.Y.), in which it was held that the Juvenile Delinquency Act was unconstitutional to the extent that

---

Government relies on appellant's admission that he was familiar with juvenile procedures in the state court and the testimony of Tamres regarding his conversations with appellant's counsel.

6. On the basis of the entire colloquy between court and counsel it could reasonably be inferred that the Government intended to call Chrein as a witness at the adjourned hearing.

it required a juvenile defendant to waive his right to jury trial in order to be proceeded against under the Act.[7] No appeal was taken and since that decision it has been the practice in this circuit to accord a juvenile a jury trial if he desires it. This was expressly recognized by the court at the hearing on February 9, 1970 involving one of the other defendants, the court stating to counsel that the defendant "would be entitled to a jury trial on the juvenile delinquency charge if he demanded it." (T 12) It is clear accordingly that if appellant had been properly advised of his rights he would have known that he would be entitled to a jury trial even though proceeded against as a juvenile delinquent.

There is no evidence that the effect of the *Nieves* decision was brought to appellant's attention; nor can it be determined from the evidence whether his counsel was aware of the decision. The conversations between Tamres and appellant's counsel took place between July, 1968 and January, 1969. Tamres testified that he had been informed by appellant's counsel that appellant felt that if he went to trial he "could beat the charges." Tamres did not recall any conversation relating to the "belief at that time that a juvenile was not entitled to a trial by jury", which, as the court pointed out, had "been cancelled recently."

Under section 5033 a juvenile consenting to proceeding under the Act would waive indictment and a jury trial. This would present a possible advantage to prosecution as an adult. But under *Nieves*, and the practice followed at the time of appellant's trial, he would have been entitled to a jury trial even though

he consented to proceedings under the Act. In other words, he had everything to gain and little, if anything, to lose, by executing a consent. We are not aware of any rights which he would have waived by consenting to juvenile treatment, nor has the Government suggested any possible advantage to appellant through his prosecution as an adult.

On the other hand, there would have been substantial benefits to treatment under the Act. Appellant would have been adjudicated a juvenile delinquent and would not have a criminal record. He would not lose his civil rights. He could not be committed "for a period exceeding his minority or the term which might have been imposed had he been tried and convicted of the alleged violation for which he was determined delinquent, whichever occurs first." 18 U.S. C. § 5034. The cases where a juvenile would knowingly have refused consent had he been fully informed concerning his rights and the consequences of his decision must be rare indeed.

As noted, *supra,* there is no statutory requirement that a juvenile be apprised of his rights except when he executes a written consent to procedure under the Act. We reject the suggestion that the failure of the commissioner or court to apprise appellant of his rights invalidated the proceedings. We do hold that the evidence is insufficient to sustain a finding that appellant knowingly refused to consent to juvenile treatment.

█ We hold further that in the future a juvenile, as defined by the Act, should be informed by the magistrate or court at the time of arraignment of his right to be proceeded against as a juvenile and all of the consequences of his

**7.** We are concerned here only with the question of whether the appellant *knowingly* refused to consent to treatment as a juvenile. At the time the appellant was arraigned, the practice of this circuit mandated jury trial for all juveniles if they requested it. Whether or not McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), ruling that there is no constitutional right to jury trial in state juvenile proceedings, invalidated the holding in

*Nieves* that à *federal* offender cannot be required to waive his right to jury trial in order to receive treatment as a juvenile, as one court has held, Cotton v. United States, 446 F.2d 107 (8 Cir. 1971), it has no effect on the decision reached here. The continuing validity of *Nieves* is not relevant to the conclusion that the appellant did not make a knowing election in this case, in light of the alternatives then available to him and their respective consequences.

decision, and that a written statement should be taken if he refuses to consent. This is in accord with the practice recommended by the Federal Judicial Center. Counsel for the Government in oral argument indicated that it is now generally followed in the Eastern District of New York.[8]

It is almost two years since appellant's conviction. He received the jury trial to which he was entitled. We conclude that the judgment of conviction should be reversed and the indictment expunged from the records. However, since the criminal process employed against the appellant did not prejudice his right to a fair determination of his guilt, and the guilt determining process was the same as if he had elected juvenile treatment, the proper course is to remand this case to the district court for resentencing pursuant to the provisions of the Juvenile Delinquency Act.

Reversed and remanded for resentencing.

8. The Federal Judicial Center has issued a "Bench Book" prepared under the supervision of a committee of district court judges from material furnished by other judges, who used the book over a test period before its final compilation. This includes the information which should be given to a juvenile at the time of his arraignment. (Bench Book for United States District Judges, § 1.07)